RAWLS, Judge
(dissenting).
The majority opinion did not see fit to set forth proceedings had between the prosecutor, the witness Thompson (Florida Sheriff’s Bureau Special Agent), the defendant’s attorney, the court, and witness Thompson’s testimony, concerning the admissibility of an excerpt of the contents of Cotita’s statement.
The following extracts from the transcript are material:
“Q. [Prosecutor] Will you tell us, Mr. Thompson, what the defendant did and what he said at the Sheriff’s office concerning these particular items that I just now asked you about?
“A. [Thompson] Well, now, he was actually questioned in relation to these items and then he was confronted with a statement that Jerry Cotita had made.
“Q. Mr. Thompson, I show you a statement here and ask you can you identify this statement?
“A. Yes sir, this is the statement that we took from Jerry Cotita.
“MR. I-IARRELL: [Defendant’s Attorney] We want to object to any statement taken from anybody else. I think it is prejudicial to this defendant. We object to any elusion [sic] whatsoever to any other statement made by anybody unless it was in the presence of this defendant.
“MR. BARKSDALE: [Prosecutor] If Mr. Harrell will give me a chance I will be glad to clarify that about how he went over this statement.
“THE COURT: The Court will exclude the Jury to ascertain if the statement is proper.
“THEREUPON, the Jury retired to the jury room and the following proceedings were had out of the presence of the Jury.
“THE COURT: The Court will sustain the objection.
“MR. BARKSDALE: We proffer to prove that, among other things, Mr. Thompson is going to testify concerning that he took this particular statement made by Mr. Cotita and confronted Mr. Trimble with it and asked him if the statement was correct in many particulars and when he did so Mr. Trimble confirmed that the statement was correct in the particulars about which he asked him from the statement.
“MR. HARRELL: We want to object to the statement, on the ground that never did Mr. Trimble read the statement there. It is ture, [sic] I think, Mr. Thompson said, “Well, we have taken a statement from Jerry and we know everything about it” or something like that, but that certainly doesn’t make Mr. Trimble’s statement admissible.
“TPIE COURT: The Court overrules the objection.
“MR. HARRELL: I wonder if I might make my objection clearer for the record. The Defendant objects to the introduction of any portion or any part of the statement or confession of Marion G. Cotita on the following sev *334 eral grounds, first that it is irrelevant, immaterial and incompetent; second, that it should be inadmissible because it is hearsay as to the defendant, Trim-ble ; third, that it is in violation of the constitutional rights of the defendant, Trimble; fourth, that it is not the best evidence.
“Now, Your Honor, before the Jury comes back, I think we would like to ask him to show which parts Mr. Thompson is going to read and then we would like to proffer the testimony of Mr. Trimble on the ground that he directly assented to it. We are going to proffer his testimony in the record for the purpose of showing he did not at any time assent to any portion of it.
“THE COURT: I don’t think that is proper testimony at this time.
“MR. HARRELL: I will make the proffer in the record.
“THE COURT: The Court overrules the defendant’s objection to the admissibility of certain portions of the statement made by Cotita to Officer Thompson and will restrict the statement of Thompson relative to the confession to,those portions which were assented to and read to the Defendant. Just to clarify that, directly assented to by the defendant.
“MR. HARRELL: For the purpose of the record, the Defendant proffers prior to the time that the Jury returns to have Mr. Trimble take the stand and give evidence that at no time did he assent to the matters and things contained in the statement of Marion Gerald Cotita nor was he specifically interrogated from this statement with direct quotes by Mr. Thompson.
“THE COURT: The Court will reserve ruling on this proffer you made Mr. Harrell until the testimony has been taken of Mr. Thompson.
“THEREUPON, the Jury returned to the jury box and the following proceedings were had in the presence of the jury.
“Q. Mr. Thompson, I had referred you to this statement, would you again tell the Gentlemen of the Jury who made that statement, please, and where it was made ?
“A. Jerry Cotita at the Sheriff’s office here in Pensacola.
******
“Q. Did you read any portion of that statement made by Mr. Cotita to Mr. Trimble?
“A. Yes, sir, I did.
“Q. Were there any portions of that statement ever assented to as being correct by Mr. Trimble?
“A. Yes, sir.
“Q. Now, will you please take this statement, Mr. Thompson, and tell us what portions of the statement that you read to Mr. Trimble and what his answers were to those portions, as far as the portions are concerned that he actually assented to?
“A. May I refer to my own copy which I have outlined.
“Q. Yes.
“A. This is the — this is a copy of the statement here. I presented the statement to Trimble, the defendant, and I informed him that this was a statement from Cotita, I showed him the top of the statement and the last page which had been signed by Cotita and then I read — you want the excerpts that I read?
“Q. Yes, sir, the excerpts that he actually assented to. Will you please read these to the Gentlemen of the Jury.
“A. This is the question here, ‘THOMPSON: Now, at the time after your arrival at the Sheriff’s office the Sheriff, Mr. Solari and myself *335 questioned you in relation to some alleged stolen property you might have in your possession. Is that correct ?' COTITA: Why, yes, it is. THOMPSON : Can you relate any of the circumstances regarding any stolen property that you might have had in your possession? COTITA: Well, I was asked about the stolen property and was asked would I consent to a search of my house, to which I said “Yes, that I would go with Sheriff Davis”. Then I consented to go with them to my house and show them a TV set that I purchased from Joe Ruther. THOMPSON: Jerry, who actually accompanied you to your house with your consent? COTITA: With my consent Sheriff Davis, Solari and an officer from the Sheriff’s Bureau. We went to my house to check on the TV set and while we were there I voluntarily turned in all of the stuff I had in my house which was known to me or believed to be the property of Joe Ruther. When we got to the house I showed them a TV set, I decided to go through the house and pick up several other items, radios, mirrors, chairs, well, it was several radios’. That was all on that particular page, and then on page No. 4, ‘Davis — ’, this is the Sheriff, ‘Jerry, I would like to ask you this one question. How did you come into possession of this property? Would you tell in your own words how you became the owner of this property? COTITA: On April Sth between 8:30 and 9 :00 o’clock I was at home doing some painting, I was off work that day, off duty, I received a phone call from Officer Dean Trimble that Joe Ruther had been arrested and that Joe Ruther had some items in his garage that he wanted me to dispose of for him because he couldn’t get to them, he was on duty. Officer Trimble called me and he told me that he had some things in his garage that he wanted moved, he couldn’t take care of them, he was on duty and I was off. He mentioned that his garage was locked and for me to just take the lock off the door and go in. I said, “Dean, I don’t want to tear your garage up”, I said, “I will come on down and get the key from you”, which I did. I drove down town and met him at Wright and Railroad Streets. He gave me the key to his garage. I went back to his garage unbeknowing to his wife, she didn’t even know I was in the yard. I pulled up in the back of his garage, I loaded several boxes of radios and assorted stuff which I didn’t check at that time, I just loaded it, and three TV sets which have been mentioned in this statement into my station wagon. I didn’t know what to do with them, the things. I covered them up for awhile. I didn’t know what to do with them. I had no instructions. I was told to dispose of them, which I didn’t want to do. I brought the things back to my house, home, and they have been there up until now, until tonight. THOMPSON: Now, most of these items that you removed from your garage are items you just went through like the transistor radios and the television sets, are these the items that you are referring to? COTITA: Yes, they are the items I moved out of Trimble’s garage’. That is all on that.
“MR. HARRELL: Excuse me. Mr. Thompson, are you testifying from your recollection or from notes you have since made or what?
“A. Immediately after I interviewed Dean Trimble I marked this statement, at the'time that I was marking it.
“MR. HARRELL: I wonder if I might see the statement and examine it.
“A. I didn’t read them that particular part. This is on page eight. ‘Now, Jerry, whose garage are you referring *336 to when the Sheriff just asked you that question? COTITA: Dean Trimble, my next door neighbor’, then I asked him or Thompson, ‘Now, Joe Ruther, has he been a frequent visitor to Dean Trimble’s house? COTITA: Quite frequently’, and the other part went on into questioning him on after that.
******
“Q. Now concerning this statement, a portion of which you have read, did you let the defendant, Mr. Trimble, read the entire statement?
“A. No, sir, I didn’t.
“Q. Why not?
“A. Because there is information that we had in the statement that had no bearing on Trimble.”
Various portions of Cotita’s alleged statement read by Thompson were matters outside of the personal knowledge of Trimble. For instance, Cotita said: “Well, I was asked about the stolen property and was asked would I consent to a search of iny house, to which I said yes, that I would go with Sheriff Davis. Then I consented to go with them to my house and to show them a TV set that I purchased from Joe Ruther.” Parts of the statement referring to the officers going to Cotita’s house and searching same were outside the personal knowledge of Trimble. Other declarations on the part of Cotita such as “I went back to his garage unbeknowing to his wife, she didn’t even know I was in the garage * * * ” It is axiomatic that such statements being outside of the knowledge of Trimble, that he could not have assented to the truthfulness of same. Trimble could not have testified that Cotita assented for the officers to have searched his house, or that Cotita went to the garage unbeknow-ing to Trimble’s wife. It is an unusual procedure and a strange rule of evidence that permits an officer to testify as to matters and things that were said by a third party and the matter being outside of the knowl~ edge of the defendant, upon the ground that the defendant assented to the truthfulness of same, this being especially true when it is obvious that the defendant could not have so testified.
Bearing in mind the testimony pertaining to the reading by the witness Thompson of excerpts of Cotita’s alleged confession, it is my opinion that to say, as the majority has, that Cotita’s confession as such was not received in evidence is but a play upon words. Thompson testified that Cotita had made a confession; Thompson read the excerpts of the confession that he saw fit to select; the jury watched and heard Thompson read excerpts of said confession and, in my humble judgment, it is only by straining at a gnat’s eyebrow can it be said that portions of Cotita’s supposed confession were not presented to the jury.
I believe the proceeding as was had concerning the reading of Cotita’s confession is clearly violative of the rules of evidence pertaining to hearsay. Reducing the testimony pertaining to same to its simplicity this is what occurred: Thompson said that the defendant said that certain portions of Cotita’s statements were correct; however, bear in mind that the defendant proffered the proof prior to reading from Cotita’s statement by Thompson that at no time did he assent to the matters and things contained in Cotita’s statement, nor was he specifically interrogated from this statement with direct quotes by Thompson.
It is conceded by the state that Cotita’s statement was taken outside the presence of this defendant. Cotita did not testify. Trimble was not afforded the opportunity of cross examining Cotita. A substantial portion of Cotita’s alleged statement would have been inadmissible had Cotita attempted to testify to same. The procedure followed in admitting the excerpts of Cotita’s statement disregarded the basic rules of evidence.
*337 In Anderson v. State,[1] a case decided in 1888, the Supreme Court of Florida established the rule in Florida that if two parties have been engaged together in an offense, the confession of one of them after completion of the offense, is not allowable as evidence against the other. This rule was modified in Anthony v. State.[2] There, a codefendant by the name of Moore made a statement when he and Anthony were before the committing magistrate. Then the court upholding the testimony of a witness as to the contents of Moore’s statement, said:
“The record before us shows that only that part of Moore’s statement that Anthony expressly assented to and stated to be correct was put in evidence against him, and we do not see what ground of complaint he has on this account. It was a statement not simply acquiesced in, but stated by him to be correct, and to this extent it was his own statement.”
This case stands as authority for the rule that a confession by a codefendant, accomplice or accessory, made in the presence of the defendant and stated by said defendant to be correct, is admissible against such defendant; however, it does not extend the rule as to statements made outside of the presence of the defendant.
The majority opinion states that the fact that the ruling in the Anthony case was based upon the codefendant’s confession being made in Anthony’s presence, while here Cotita’s confession was made outside of defendant’s presence, is a distinction without a difference. I cannot reconcile such statement with the rule clearly enunciated in McDowell v. State,[3] which case the majority opinion did not see fit to cite, wherein the court stated:
“It is true that an admission or confession made by an accessory could not be admitted against the appellant when it appears that the admission or confession was not made in her presence.”
In my opinion, the holding of the majority opinion in the instant cause is in direct conflict with the rule enunciated by the Supreme Court of Florida in Anthony v. State, supra, and McDowell v. State, supra, wherein it is concisely stated that an admission or confession made by an accessory cannot be admitted against the defendant when same was not made in his presence.
To further substantiate my views, I refer to the case of Rankin, Vile, King and Zuniga v. State of Florida,[4] which I think is to some extent analogous to the instant cause. The appellants in that case were convicted of murder in the first degree, sentenced to die and appealed.
During the course of the trial, the court at the request of the state called two witnesses, Richard Penney and Allen Jenkins, who had occupied a small cell in the “Flat Top” at Raiford prison with the defendants at the time another prisoner in the same cell was murdered. Penney was called to the stand by the prosecution and was declared a hostile witness. During his interrogation, it appeared that Penney had conveniently lost his memory. He was asked about signing a statement — he couldn’t remember. He was shown a written instrument and stated that the name was his but he did not remember whether or not it was his signature. The jurors were then excused. The prosecutor then read a statement purportedly made by Penney and again Penney replied to the question “I don’t remember sir.” After the jury returned to their box, the prosecutor again interrogated the witness with particular questions that he had “de *338 ducted from the statement.” Upon objection, the judge cautioned the jury “to absolutely disabuse [their] minds of those statements as far as their evidentiary value are [sic] concerned.” The witness Allen Jenkins was called by the state as a hostile witness and declined to say anything. In the absence of the jury, the prosecution represented to the court that Jenkins had on a particular date in the “Interview Room” at the prison in the presence of the State Attorney, Assistant State Attorney, Assistant Warden, Captain of the Guard and court reported made and signed a statement.
The court in passing upon the propriety of the prosecution using the contents of the purported statements as a method for interrogating the witness, stated as follows:
“The question developed by this procedure is whether or not the State, upon impeaching a court witness by showing that he had formerly appeared and made a statement, which at the time of trial he says he does not recall, may go further and introduce the contents of the statement.
“It is plain to us by the original ruling that the trial judge frowned upon such procedure when he restricted the introduction to the mere time and place of the statement and this thought is confirmed by his action in meticulously instructing the jury that the questions and answers repeated by the State Attorney could be considered only for the purpose of impeachment and not as substantive testimony. Yet the jury got from the reading of the questions, purportedly asked the witness at the time of the interview, and the answers presumably given and repeated at the trial a description of the horrible crime with which appellants had been charged and convicted and this procedure we cannot sanction. We think it was prejudicial error that requires a reversal of the judgment.”
Now analogizing the Rankin case with the case at bar, there, as to the witness Jenkins, it was conclusively proven in the absence of the jury that his own statement was reduced to writing in the presence of the court reporter and four officials, and the witness did not deny making the statement. As to the witness Penney, it was proved that he signed a written statement, which signature he did not deny — just could not remember. Irrespective of the unrebutted proof of the witnesses making the statement, the Supreme Court held that it was error to utilize same as a basis for interrogation. In the case at bar it is not contended that the witness [defendant] made the statement, but rather that a third party who was not called to testify volunteered the contents of same. Surely, if the contents of a statement as shown in the facts of the Rankin case cannot be utilized for the interrogation of a witness, then such procedure constitutes reversible error as applied to the facts in the case at bar. The majority opinion appears to be in clear conflict with this latter opinion of the Supreme Court.
Consequently, it is my conclusion that under the facts and circumstances of this case, Thompson’s reading at random from Cotita’s statement taken outside of the presence of the defendant, constituted prejudicial error which permeated the trial of the defendant, and for this reason the cause should be reversed for a new trial.

. Anderson v. State, 24 Fla. 139, 3 So. 884 (1888).

. Anthony v. State, 44 Fla. 1, 32 So. 818, 821 (1902).

. McDowell v. State, 160 Fla. 588, 36 So.2d 180, 181 (1948).

. Rankin v. State, Fla., 143 So.2d 193.